QUARLES & BRADY LLP
One Renaissance Square
Two North Central Avenue
Phoenix, Arizona 85004-2391
Telephone: (602) 230-4622
Facsimile: (602) 229-5690
Isaac M. Gabriel, Esq. (AZ Bar No. 021780)
*(admitted pro hac vice)*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>15 JOHN CORP.,<br>a/k/a LES HALLES,<br>a/k/a FIRST ADMIN INC.,<br><br>           Debtor. | Chapter 11<br><br>Case No. 16-12453 (MEW) |

### REWARDS NETWORK ESTABLISHMENT SERVICES INC.'S
### MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE

This Motion is filed by REWARDS NETWORK ESTABLISHMENT SERVICE INC. ("**Rewards Network**"), a secured creditor and party-in-interest in the above-captioned Chapter 11 bankruptcy case (the "**Bankruptcy Case**") of 15 JOHN CORP. (the "**Debtor**").

The Debtor, and the Debtor's president and 100% owner, Philip Lajaunie, have proven to be completely untrustworthy, thereby necessitating the immediate appointment of a Chapter 11 Trustee. Among other things, the Debtor and its individual owner have committed the following bad acts:

- The Debtor filed this case and did not obtain any authorization to use cash collateral or file a motion to authorize the use of cash collateral

- Despite (i) having received $600,000 from Rewards Network in March, 2016, and (ii) Rewards Network's filing a UCC financing statement filed in the publically available records, the Debtor failed to provide notice of

    its Bankruptcy Case to Rewards Network or list Rewards Network on its creditor matrix filed with the Court.

- The Debtor (and its affiliate) materially misrepresented their financial condition to Rewards Network in order to obtain $600,000 from Rewards Network, and breached the Agreement within two (2) weeks of its execution.

- The Debtor failed to disclose to Rewards Network that it was a Defendant in class action lawsuit that had been filed against it in 2012, which is the purported cause of the Debtor's bankruptcy filing.

- The Debtor's officers, who are also officers for an affiliate that entered into the agreement with Rewards Network, failed to disclose to Rewards Network that the affiliate's lease had expired and the affiliate was subject to eviction proceedings.

- Upon information and belief, the Debtor's individual owner diverted Rewards Network's payment of $600,000 to non-business uses, including possible transfers to insiders.

- The Debtor failed to disclose to Rewards Network that it was subject to eviction proceedings.

Based on the foregoing, cause exists under Bankruptcy Code § 1104 to appoint a Chapter 11 trustee, which is in the best interests of creditors rather than conversion of the case. This Motion is supported by the attached Memorandum of Points and Authorities and by the entire record before the Court in the Bankruptcy Case.

Dated: September 19, 2016  
        Phoenix, Arizona

Respectfully submitted,

/s/ Isaac M. Gabriel  
Isaac M. Gabriel (admitted *pro hac vice*)

QUARLES & BRADY LLP  
One Renaissance Square  
Two North Central Avenue  
Phoenix, AZ  85004-2391  
Telephone: (602) 230-4622  
Facsimile: (602) 229-5690  
Email: isaac.gabriel@quarles.com

*Attorneys for Rewards Network Establishment Services Inc.*

QB\116122.00235\41539678.3

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.  **FACTUAL AND PROCEDURAL HISTORY**

1. On August 25, 2016 (the "**Petition Date**"), the Debtor filed its Bankruptcy Case, thereby initiating the above-captioned proceedings.

2. This Court has jurisdiction over this Bankruptcy Case and this Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. This Motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

3. The Debtor is in the business of owning, managing, and operating a restaurant named Les Halles (the "**Restaurant**").

4. The Debtor continues to operate the Restaurant postpetition as debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

**The Purchase Agreement and Rewards Network's Ownership of Receivables**

5. Rewards Network is a company that provides its members with incentives and rewards through loyalty programs it operates when its members dine at participating restaurants. Rewards Network provides marketing and advertising of its participating restaurants to its member base in order to encourage members to dine at the participating restaurants. Rewards Network also contracts with participating restaurants and purchases future accounts receivables generated by Rewards Network's members as well as other customers.

6. On March 10, 2016, the Debtor and Rewards Network entered into the *Rewards Network Receivables Purchase And Marketing Agreement* the (as amended from time to time, the "**Agreement**"), whereby Rewards Network paid $600,000 (the "**Purchase Price**") to purchase certain future credit card receivables (the "**Receivables**") and agreed to provide

-3-

marketing and other services to the Debtor. A true and correct copy of the Agreement is attached hereto as Exhibit "A".[1]

7. Pursuant to the Agreement, upon receipt of the Purchase Price (as defined in the Agreement), Rewards Network became the owner of the Receivables, and the Debtor agreed it would have no ownership rights in the Receivables. Agreement at p.2, ¶1 (stating, "Upon your receipt of the Purchase Price, [Rewards Network] will own all right, title and interest in the Card Receivables we bought. You will no longer have any rights in those Card Receivables.").

8. Pursuant to the Agreement, the Debtor also agreed that Rewards Network would take delivery of the Receivables as they are generated in the ordinary course of the Debtor's business. *Id*. Under the Agreement, the Receivables are tracked by Rewards Network using information provided by Debtor's credit card processor, and then delivered to Rewards Network via an automated clearing house ("**ACH**") debit from the Debtor's designated bank account. *Id*. at ¶¶ 6, 8.

9. The Debtor continues to generate Receivables owned by Rewards Network through the ordinary course, postpetition operation of the Debtor's Restaurant.

10. Rewards Network is the rightful owner of the Receivables and the Receivables are not property of the Debtor's bankruptcy estate under Bankruptcy Code § 541.

---

[1] The Agreement was also entered into by the Debtor's affiliate, La Boucherie, Inc. ("**La Boucherie**"). However, pursuant to several provisions of the Agreement, the Debtor is liable for the entire "Amount Sold" of the Card Receivables. *See, e.g.,* Agreement at p.2 (stating, "If the Merchant consists of more than one legal entity or location, then you agree that each of those entities … will continue to remit to [Rewards Network] the Specified Percentage of Card Receivables from that entity … until we have received the entire Amount Sold.").

**Rewards Network's Springing Lien and Secured Claim Against the Debtor**

11. To secure the obligations owing under the Agreement, the Debtor granted Rewards Network a blanket lien and security interest in all of the Debtor's personal property, tangible and intangible (collectively, the "**Collateral**"), including:

> all equipment, furniture, artwork, inventory, instruments, investment property, documents, general intangible, deposits, contract rights, filenames, trademarks, patents, supporting obligations, payment intangibles, chattel paper, commercial tort claims, licenses, vendor licenses, permits, franchise agreements, payments due from creditor card and bank card companies or processors, accounts receivable, accounts, leases, deposits accounts, refunds or bonds…

*See* Agreement, p. 6, ¶18.

12. To provide notice of its purchase of the Receivables and to perfect its lien in the Debtor's assets, on March 15, 2016, Rewards Network filed a UCC Financing Statement with the New York Department of State at File No. 201603155303679 (the "**UCC Financing Statement**"). A true and correct copy of the UCC Financing Statement is attached hereto as Exhibit "B". The Agreement, the UCC Financing Statement, and any and all amendments or modifications to any of the foregoing may be referred to collectively hereinafter as the "**RN Documents.**"

13. However, Rewards Network agreed that the foregoing lien and security interest would not become effective unless and until the Debtor committed a "bad act", resulting in an Event of Non-Performance under the Agreement. Agreement, p. 6, ¶18.

14. An Event of Non-Performance is deemed to have occurred if any representation given under paragraph 11 of the Agreement was "false or misleading." *See* Agreement p. 4, ¶12(k). An Event of Non-Performance also occurs if Rewards Network is unable to debit either the Debtor's bank account or La Boucherie's bank account for the amount of any Merchant Payment (defined in the Agreement) owed to Rewards Network. *Id*. at ¶12(g).

**The Debtor's Material Misrepresentations and Events of Non-Performance**

15. The Debtor's 100% owner and President, Philip Lajaunie, has proven that he is not an honest individual. Among other things, in entering into the Agreement with Rewards Network, Mr. Lajaunie represented the following:

- The Debtor was meeting its current liabilities as they were coming due. Agreement, p.4, ¶11(e).
- The value of the Debtor's assets exceeded the amount of its liabilities. *Id*. at ¶11(d).
- The Debtor had not considered or discussed with anyone the possibility of filing a bankruptcy petition. *Id*. at ¶11(g)
- The Debtor would use all of the Purchase Price solely for its business purposes. *Id*. at ¶11(j)

16. Mr. Lajaunie did not disclose to Rewards Network that it was a Defendant in class action lawsuit that had been filed against it in 2012 and is the purported cause of the Debtor's bankruptcy filing. *See* Declaration Pursuant To Local Rule 1007 [Dkt. No. 4] at ¶4 (stating that this bankruptcy was filed to forestall a substantial class action lawsuit filed in 2012, with judgment entered earlier this year).[2]

17. Moreover, on behalf of the Debtor's affiliate, La Boucherie, Mr. Lajaunie represented the following in entering into the Agreement:

- La Boucherie was meeting its current liabilities as they were coming due. Agreement, p.4, ¶11(e).
- The value of La Boucherie's assets exceeded the amount of its liabilities. *Id*. at ¶11(d)

---

[2]   The Judgment was entered on August 10, 2016, and the District Court referred the matter to Magistrate Judge Netburn "to award damages for Plaintiffs' claim for misappropriation of gratuities under NYLL § 196-d in conformity with the Court's Summary Judgment Opinion, in which the Court concluded that Plaintiffs may recover 'unlawfully retained tips' for violations of Section 196-d but are not "entitled to recover tip-credit damages under NYLL on this basis." *See* Docket No. 260 in *Murphy et al. v. 15 John Corp. et al.*, S.D.N.Y. Case No. 1:13-cv-06503-RJS-SN. The Debtor and his counsel were also sanctioned for discovery violations. *Id*. A true and correct copy of the relevant portion of the docket is attached hereto as Exhibit "C".

QB\116122.00235\41539678.3

- La Boucherie had not considered or discussed with anyone the possibility of filing a bankruptcy petition. *Id*. at ¶11(g)

- La Boucherie had no reason to believe its business would be closing within the next year. *Id*. at 11 (g).

- The Debtor would use all of the Purchase Price solely for its business purposes. *Id*. at ¶11(j).

18. Mr. Lajaunie also did not disclose to Rewards Network that La Boucherie's lease had expired *in November, 2015* and that La Boucherie was a holdover tenant, subject to eviction.

19. Mr. Lajaunie further did not disclose to Rewards Network that La Boucherie's landlord had commenced eviction proceedings against La Boucherie in December, 2015 -- i.e., approximately three months *before* entering into the Agreement with Rewards Network and making the above representations. *See* article dated March 30, 2016 attached hereto as Exhibit "D".[3]

20. Prior to executing the Agreement, on March 10, 2016, representatives of Rewards Network also held a "due diligence" call with Yoko Iizuka, who represented herself to be the Chief Financial Officer of the Debtor and La Boucherie.[4] Having already reviewed certain financial documents provided to Rewards Network by the Debtor and La Boucherie, Rewards Network specifically asked the following questions of Ms. Iizuka:

- Is there any other material debt pertaining to the restaurants not shown or on a related corporation?

- What is the projected use of funds?

- Please explain any open law suits, audits, or tax liens?

---

[3]    Undersigned counsel has briefly searched various state court dockets to attempt to locate this eviction lawsuit, but has been unable to do so at this point. Regardless, it is undisputed that La Boucherie closed its doors and/or was evicted approximately two (2) weeks after signing the Agreement.

[4]    In the Debtor's Declaration [Dkt. No. 4], Mr. Lajaunie now claims that he is the sole officer of the Debtor and makes no mention of a CFO.

-7-

21. Ms. Iizuka represented that there were no undisclosed material debts pertaining to either of the restaurants, and further represented that neither restaurant was subject to any open lawsuits. *See* Declaration of Steven Gehard attached hereto as <u>Exhibit "E"</u>.

22. Accordingly, based on the representations made in the Agreement and during the conference call, the parties entered into the Agreement and on March 10, 2016, Rewards Network paid $600,000 to the Debtor and La Boucherie.

23. Notwithstanding this payment, on or about March 25, 2016, La Boucherie ceased operations.

24. The Agreement provides that if either the Debtor's Restaurant or La Boucherie went out of business within 45 days of Rewards Network's payment of the Purchase Price, "there shall be a rebuttable presumption that [Mr. Lajaunie's] representations in Sections 11(d), (e), (g) and (i) were materially untrue when they were made." Agreement at p.4, ¶11.

25. Upon information and belief, given the timing of the payment from Rewards Network and the closing of La Boucherie, Rewards Network asserts that Mr. Lajaunie diverted a portion of the $300,000 payment allocated to La Boucherie to non-business uses. The Debtor has failed to provide bank records to Rewards Network as of the date of this Motion despite request. *See* email request to Debtor's counsel dated September 12, 2016, attached hereto as <u>Exhibit "F"</u>.

26. Moreover, on or about April 5, 2016 -- less than one month after entering into the Agreement -- the Debtor placed an intentional "stop payment" on its bank account, preventing Rewards Network from processing automated debits for the amounts due as provided under the Agreement.

27. The foregoing events each constituted "bad acts" under the Agreement, thereby causing Rewards Network's blanket lien and security interest to become effective immediately upon the signing of the Agreement.

28. On April 14, 2016, Rewards Network provided notice of the Debtor's and La Boucherie's breach under the Agreement. A true and correct copy of such notice is attached hereto as Exhibit "G".

### The Debtor's Bankruptcy Filing

29. On August 25, 2016, the Debtor filed its Chapter 11 bankruptcy case.

30. Despite being fully aware of Rewards Network's claim and entering into the Agreement just (5) five months earlier, the Debtor failed to provide notice of its filing to Rewards Network or list Rewards Network on its creditor matrix filed with the Court.

31. Despite Rewards Network's lien and filing of its UCC Financing Statement, the Debtor did not contact Rewards Network to obtain consent to use cash collateral.

32. On September 7, 2016, Rewards Network learned of the Debtor's bankruptcy filing and notified the Debtor's counsel that it had not consented to the use of cash collateral. *See* emails between I. Gabriel to L. Fox attached hereto as Exhibit "H". The Debtor did not offer any adequate protection or file a motion to authorize use of cash collateral. Instead, the Debtor simply continued operating in violation of the Bankruptcy Code.[5]

---

[5] In his response email, Debtor's counsel claimed there was no cash on hand as of the Petition Date. *See* Exhibit "H". The Debtor did not timely file its statements and schedules in this case, so there is no way to verify that contention. Moreover, any accounts receivable (including lagging credit card receivables due from any processor), inventory, proceeds of inventory, and other cash equivalents all fall within the definition of "cash collateral". It is difficult to believe that the Debtor had none of these assets upon the Petition Date, yet somehow remains a viable operation.

QB\116122.00235\41539678.3

33. Rewards Network asserts a secured claim against the Debtor in the amount of at least $664,018.14, comprised as the undelivered Card Receivable balance under the Agreement. *See* Agreement at ¶13(a).

## II.    LEGAL ARGUMENT.

### A.    There Are Multiple Grounds For the Appointment of a Trustee Under Bankruptcy Code § 1104.

#### 1.    Cause Exists Under § 1104(a)(1)

Pursuant to 11 U.S.C. § 1104(a)(1), upon request of a party in interest, the Court shall order the appointment of a trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case . . . ."  11 U.S.C. § 1104(a)(1).  That list is not exhaustive, and other relevant factors include misuse of assets and funds, inadequate record keeping and reporting, instances of conduct found to establish fraud or dishonesty, and lack of credibility and creditor confidence.  *In re Ashley River Consulting, LLC*, No. 14-13406, 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. Mar. 31, 2015) (citing *In re Altman*, 230 B.R. 6, 16 (Bankr. D. Conn. 1999)). In determining whether "cause" exists, the Court may consider both pre and post-petition misconduct.  *Id.* at *10 (citing *Midatlantic Nat'l Bank v. Anchorage Boat Sales, Inc.* (*In re Anchorage Boat Sales, Inc.*), 4 B.R. 635, 644–45 (Bankr. E.D.N.Y. 1980)).  Upon the filing of a petition, the Debtor is obligated to engage in "open, honest and straightforward disclosure to the Court and creditors", and the failure to do so constitutes "cause" mandating the appointment of a Chapter 11 trustee. *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989).  If the Court determines that "cause" exists, the appointment of a trustee is mandatory.  *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 472 (3d Cir. 1998).

The Debtor and Mr. Lajaunie engaged in both pre and post-petition misconduct justifying the appointment of a Chapter 11 trustee. The Debtor and/or Mr. Lajaunie made a series of material misrepresentations and omissions to induce Rewards Network to enter into the Agreement, including (i) providing Rewards Network with inaccurate information about the Debtor's financial condition; (ii) failing to disclose the Debtor's involvement as a defendant in a substantial class action lawsuit; (iii) failing to disclose the expiration of the lease held by La Boucherie, its affiliate, and the eviction proceeding pending against La Boucherie, and (iv) representing that it was solvent and paying its debts as they came due. Then, only 15 days after Rewards Network paid Debtor a total of $600,000 under the Agreement, La Boucherie closed its doors and was evicted. Upon information and belief, Rewards Network alleges that during that brief 15-day period, Mr. Lajaunie impermissibly diverted a portion of the $300,000 allocated to La Boucherie to non-business uses.[6] A mere 11 days later, and less than 30 days after entering into the Agreement, the Debtor intentionally acted to prevent Rewards Network from receiving the payments due under the Agreement.

Unfortunately, the filing of the petition did not put an end to the Debtor's bad acts. The Debtor failed to include Rewards Network on the creditor matrix filed with the Court, giving Rewards Network no notice of the bankruptcy. Additionally, the Debtor has utterly failed to request permission from Rewards Network and/or the Court for authority to use cash collateral, and the case has now been pending for over three weeks. Instead, the Debtor appears to be operating its business as it pleases, completely disregarding its obligations under the Bankruptcy Code.

---

[6] Rewards Network has been unable to determine where that money went because the Debtor and La Boucherie have refused to provide any account information.

The Court should not permit the dishonest actions of Debtor and Mr. Lajaunie to go on any longer. Under Mr. Lajaunie's control, the Debtor has lost all credibility, and unequivocally failed to comply with some of its most basic duties under the Bankruptcy Code -- proper disclosure of its bankruptcy case and obtaining authority to use cash collateral. In fact, the Debtor continued to use cash collateral even after Rewards Network gave its notice of non-consent. Accordingly, no creditor can be confident that the Debtor will comply with its obligations fiduciary duties going forward with Mr. Lajaunie in control. Only the appointment of an independent third party can restore credibility and confidence in the Debtor, for creditors as well as the Court. Thus, cause exists under 11 U.S.C. § 1104(a)(1), and the Court must appoint a Chapter 11 trustee to preserve the precious assets remaining in the estate for the benefit of all creditors.

      2.    A Trustee Is In The Best Interests of Creditors Under § 1104(a)(2)

In addition to "cause", the Court shall order the appointment of a trustee "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate . . . ." 11 U.S.C. § 1104(a)(2). In determining whether a trustee should be appointed under 11 U.S.C. § 1104(a)(2), courts "eschew rigid absolutes and look to the practical realities and necessities." *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (internal quotation omitted). Among the factors considered are (i) the trustworthiness of the debtor; (ii) the debtor's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment. *Id.* A Chapter 11 debtor and its managers owe fiduciary duties to the

estate, and a trustee is warranted if compliance with those duties is called into question. *In re Euro-American Lodging Corp.*, 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007).

For the same reasons discussed above, a Chapter 11 trustee is necessary to protect estate assets in this case. The Debtor absolutely cannot be trusted based upon its past and present performance. Prior to and after filing the petition, Mr. Lajaunie has demonstrated a clear tendency of dishonesty and a complete failure to abide by the obligations and fiduciary duties of the Debtor, whether under the Agreement or in the Bankruptcy Code. The Debtor has been found liable in a class-action lawsuit for illegally retaining tips from the Debtor's employees. *See* FN 2, *supra*. The Debtor misrepresented numerous facts and made numerous material omissions to induce Rewards Network to enter into the Agreement. The Debtor has not complied with the Bankruptcy Code's strict rules regarding use of cash collateral. No creditor can have confidence in Mr. Lajaunie controlling the Debtor honestly and transparently going forward.

Under these circumstances, the costs associated with the appointment of a Chapter 11 trustee are greatly outweighed by the benefits the estate will enjoy by having an independent third party step in to run the Debtor and preserve its value. The Court should therefore appoint a Chapter 11 trustee pursuant to 11 U.S.C. § 1104(a)(2).

### 3. A Trustee Is Also Justified Based On Causal Grounds Provided for in §1112.

Alternatively, cause exists under 11 U.S.C. §§ 1104(a)(3) and 1112(b), and the appointment of a trustee, rather than conversion or dismissal of the case, is in the best interests of creditors. Pursuant to 11 U.S.C. § 1112(b)(1), on the request of a party in interest the Court shall

> Convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, **for cause unless the court determines that the appointment**

-13-

> ***under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate***.

11 U.S.C. § 1112(b)(1).  For purposes of § 1112, "cause" includes, among other things, the following:

> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
>
> (B) gross mismanagement of the estate;
>
> . . .
>
> (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors . . .

11 U.S.C. § 1112(b)(4).  If cause exists under § 1112, but conversion or dismissal are not in the best interests of creditors and the estate, a trustee may be appointed to investigate the financial affairs of the debtor and protect creditors against conflicts of interest presented by debtor's management.  *In re McCorhill Pub., Inc.*, 73 B.R. 1013, 1017–18 (Bankr. S.D.N.Y. 1987).

Cause exists under § 1112(b)(1), but the interests of creditors and the estate are best served by the appointment of a trustee.  As previously discussed, the Debtor has not requested or been authorized to use cash collateral in this case.  Nevertheless, the Debtor continues to operate its business despite Rewards Networks' lien and its notice of non-consent.  Further, on information and belief, the Debtor is operating at a substantial or continuing loss to or diminution of the estate without a reasonable likelihood of rehabilitation, and has engaged in gross mismanagement of the estate.  Rewards Network asserts that each of those allegations will be substantiated once the Debtor begins filing its monthly operating reports.

Despite the fact that cause exists under § 1112, this case should not be dismissed or converted because either remedy would dramatically reduce the potential recovery for all creditors.  The Debtor's highest value is as a going concern, not through the liquidation of used restaurant equipment and furniture on the auction block.  Thus, a Chapter 11 trustee should be

appointed to operate the restaurant and generate cash flow to pay creditors or explore a going concern asset sale. Further, a Chapter 11 Trustee would be able to investigate the financial affairs of the Debtor, protect creditors against conflicts of interest presented by current management, and propose and confirm a plan of reorganization, thereby maximizing the potential recovery for creditors. Thus, the Court should appoint a Chapter 11 trustee because it is in the best interests of all creditors and the estate.

### III.  CONCLUSION

WHEREFORE, Rewards Network respectfully requests that the Court enter an Order:

A.  Appointing a Chapter 11 trustee pursuant to Bankruptcy Code §1104(a); and

B.  Granting such other and further relief deemed just and proper under the circumstances.

Dated: September 19, 2016
      Phoenix, Arizona

Respectfully submitted,

/s/ Isaac M. Gabriel
Isaac M. Gabriel (admitted *pro hac vice*)

QUARLES & BRADY LLP
One Renaissance Square
Two North Central Avenue
Phoenix, AZ  85004-2391
Telephone: (602) 230-4622
Facsimile: (602) 229-5690
Email: isaac.gabriel@quarles.com

*Attorneys for Rewards Network Establishment Services Inc.*