LEO FOX, ESQ. (LF-1947)
630 THIRD AVENUE, 18TH FLOOR
NEW YORK, NEW YORK 10017
(212) 867-9595

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

IN RE:                                          Case No.: 16-12453 (MEW)
                                                Chapter 11 Reorganization


      15 JOHN CORP.,
      a/k/a LES HALLES,
      a/k/a FIRST ADMIN INC.,


               Debtor.
------------------------------------------------------------X

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.   ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

**DEBTOR'S DISCLOSURE STATEMENT DATED MAY __ , 2017**

**INTRODUCTION**

1.     The above-captioned Debtor[1] submits this Disclosure Statement pursuant to § 1125 of the Bankruptcy Code to its known creditors in order to disclose that information deemed by the Debtor to be material, important, and necessary for the creditors to arrive at a reasonably informed decision in exercising their right to vote for acceptance or rejection of the Plan of Reorganization (hereafter the "Plan").   Only "impaired" creditors, as that term is defined in the Bankruptcy Code, are entitled to vote for the Plan or to reject the Plan.   A full definition of what constitutes impairment is contained in § 1124 of the Bankruptcy Code.   The Court has approved the adequacy of the information contained in this Disclosure Statement but such approval does not

---

[1] Capitalized terms used herein, unless otherwise defined, shall have the same meaning as defined in the Plan.

constitute any recommendation by the Court as to the merits of the Plan, whether the creditors should vote for the Plan, or if the Plan should be confirmed.

2.      A copy of the Plan accompanies this Disclosure Statement, as well as a Ballot Form for the acceptance or the rejection of the Plan.   The Debtor is requesting a combined hearing on approval of the Disclosure Statement and confirmation of the Plan in this small business debtor case.   The Debtor believes a combined hearing on disclosure and confirmation would be in the best interests of administrative efficiency and minimize the administrative costs.

3.      The Court has set _____, 2017 at __:00 _.m. for a joint hearing on the approval of the Disclosure Statement and acceptance or rejection and confirmation of the Plan.   Creditors who are entitled to vote may vote on the Plan by filling out and mailing, on or before _____, 2017 the accompanying Ballot Form to counsel for the Debtor, Leo Fox, Esq., 630 Third Avenue, New York, New York 10017.

4.      As a creditor, your vote is important.   In order for the Plan to be deemed accepted, members of each impaired class designated in the Plan that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the claims of the class that vote must vote for the Plan. A claim or interest is impaired unless the Plan: (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default; (A) cures or provides for a cure, subject to Court approval of any such default that occurred before or after the commencement of the Chapter 11 Case, other than a default of a kind specified in § 365 (b)(2) of the Bankruptcy Code; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or

interest for any damages incurred as a result of any reasonable reliance by such holder on such

contractual provision or such applicable law; and (D) does not otherwise alter the legal, equitable,

or contractual rights to which such claim or interest entitles the holder of such claim or interest.

NO REPRESENTATIONS CONCERNING THE DEBTOR ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH IS OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.  THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE.

APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT BY THE COURT DOES NOT CONSTITUTE A RECOMMENDATION BY THE COURT AS TO THE MERITS OF THE PLAN.  THE COURT DOES NOT RENDER ANY OPINION AS TO WHETHER THE PLAN SHOULD BE ACCEPTED OR REJECTED BY CREDITORS.

CREDITORS ARE URGED TO READ THE PLAN IN FULL. THE PLAN REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT BETWEEN THE DEBTOR, ITS CREDITORS, AND INTERESTED PARTIES, AND IT SHOULD BE READ TOGETHER WITH THIS DISCLOSURE STATEMENT SO THAT AN INTELLIGENT AND INFORMED JUDGMENT CONCERNING THE PLAN CAN BE MADE.

5.    The following is a summary of the classes and their treatment in tabular form:

| Class | Claim Amount | Treatment | Projected Recovery |
|---|---|---|---|
| Class 1<br>TD Bank | $90,000 | Reinstated | 100% |
| Class 2<br>American Express | $90,000 | 4% (2017), 5% (2018) and 6% (2019) of American Express credit card receivables | 100% |
| Class 3<br>Rewards Network | $600,000 (disputed) | 4% (2017), 5% (2018) and 6% (2019) of MasterCard and Visa credit card receivables | [TBD] |
| Class 4<br>Employee Priority Claims | $12,702 (estimated) | Quarterly payments of Allowed priority claim, if any, in 2018 and 2019. | 100% |
| Class 5<br>IRS Priority Claim | $2,340 (disputed) | 50% of Allowed priority claim paid by December 31, 2018<br><br>50% of Allowed priority claim paid by December 31, 2019<br><br>Non-priority claim is in Class 10. | 100% |
| Class 6<br>NYS Tax Priority Claim | $21,789.72 (disputed) | Quarterly payments of Allowed priority claim, if any, in 2018 and 2019.<br>Non-priority claim is in Class 10. | 100% |
| Class 7A<br>NYC Income/Liquor Tax Priority Claim | $66,888.79 plus interest and penalties (disputed) | 50% of Allowed priority claim paid by December 31, 2018<br><br>50% of Allowed priority claim paid by December 31, 2019<br><br>Non-priority claim is in Class 10. | 100% |
| Class 7B<br>NYC Commercial Rent Tax Priority Claim | $23,441 (disputed) | Quarterly payments of Allowed Claim, if any, in 2019.<br>Non-priority claim is in Class 10. | 100% |
| Class 8 – Class Action | Filed claim of $5,616,730.88 | Effective Date Class Payment (est. $30,000)<br><br>2017<br>$15,000 after the first | [TBD] |

| | | $120,000 of Net Income[2] plus 35% of the Net Income after the first $140,000 of Net Income<br><br>2018<br>35% of Net Income after the first $37,500 of Net Income<br><br>50 % of the Deferred Class Payment payable by December 31, 2018<br><br>2019<br>35% of Net Income<br>50% of the Deferred Class Payment payable by December 31, 2019 | |
|---|---|---|---|
| Class 9 – Ponce Creditors | Appx. $86,000 | 2017<br>$5,000 after the first $120,000 of Net Income plus 5% of the Net Income after the first $140,000 of Net Income<br><br>2018<br>5% of Net Income after the first $37,500 of Net Income<br>50 % of the Deferred Ponce Payment payable by December 31, 2018<br><br>2019<br>5% of Net Income<br>50% of the Deferred Ponce Payment payable by December 31, 2019 | [TBD] |
| Class 10 – Unsecured Creditors | Appx. $1,200,000 | *Pro rata* payments<br><br>2017<br>10% of Net Income after first $140,000 of Net Income<br><br>2018<br>10% of Net Income after first | [TBD] |

[2] "Net Income" is defined as all income and receipts of the Debtor less all actual cash expenses, general overhead and disbursements and any income taxes (other than non-cash items such as depreciation and amortization).   Payments to creditors under this Plan are considered expenses that reduce the Debtor's Net Income.   This definition applies solely for purposes of determining payments made to creditors under the Plan and is independent of any definitions under the Internal Revenue Code.

| | | $37,500 of Net Income | |
| --- | --- | --- | --- |
| | | 2019 10% of Net Income | |
| Class 11 – Shareholder interests | | To be deposited into escrow upon Effective Date; if no default after one (1) year, then returned to Lajaunie | |

## PLAN OVERVIEW

6.    Under the Plan, the Debtor shall make initial payments to creditors using cash contributed by Philippe Lajaunie ("Lajaunie"), the Debtor's principal, and shall also make ongoing payments for three (3) years after the Effective Date.   Lajaunie has also agreed to release any claims he has against the Debtor for monies loaned or advanced to the Debtor, and to deliver his 100% equity interest in the Debtor into escrow, and to continue to be employed by the Debtor and using his considerable reputation to enhance the Debtor's operations, in consideration of receiving releases and discharges of claims asserted against him by creditors of the Debtor.

## BACKGROUND

**A.    Overview of the Debtor**

7.    The Debtor is in the business of owning and operating its restaurant operation known as "Les Halles" from real property located at 15 John Street, New York, New York 10036, a well-known restaurant in the New York City area serving celebrities and well connected and fashion related clientele.   The Debtor originally opened its doors in 1998 at the subject premises.   Lajaunie is well known in the industry and has operated over 20 restaurants in various locales over the past 30 years, including Les Halles, which was a six (6) restaurant chain operating in the United States and Japan.   First Admin Inc. is the "bookkeeping entity" that provides other administrative services for the Debtor by arranging to issue disbursements and other expenses for the Debtor.

**B.    This Bankruptcy Case**

8.      On August 25, 2016 (the "Petition Date"), the Debtor commenced a voluntary

Chapter 11 case in the United States Bankruptcy Court for the Southern District of New York.   No

receiver, examiner, or creditor's committee had been appointed in this Chapter 11 Case.

9.      Between September 23, 2016 and September 27, 2016, the Debtor filed its

Schedules of Assets and Liabilities [Dkt. Nos. 21-24] (the "Schedules").   On September 22, 2016,

the Debtor filed its Statement of Financial Affairs (the "SOFA").

**C.    Alleged Secured Claims**

**(a) TD Bank**

10.     Pursuant to a Business Loan Agreement and Promissory Note dated June 8, 2012,

TD Bank, N.A. ("TD Bank") provided a $100,000 line of credit to the Debtor.   The Debtor has

drawn on the entire line of credit.   Pursuant to a Commercial Security Agreement dated June 8,

2012, the Debtor's obligation to repay the line of credit secured by all inventory, equipment,

accounts, chattel paper, instruments, letter-of-credit rights, documents, deposit accounts,

investment property, money, other rights to payment and performance, and general intangibles of

the Debtor.   TD Bank is presently owed approximately $99,000 on the loan (the "TD Bank

Claim"). The Schedules state that the Debtor's hard assets totaled $10,000 as of the Petition Date.

**(b) American Express**

11.     Pursuant to a Business Loan and Security Agreement dated September 5, 2014,

among American Express Bank, FSB ("American Express"), the Debtor and La Boucherie, Inc.

("La Boucherie").   American Express loaned $1,000,000 to the Debtor and La Boucherie for

which they are jointly and severally liable for repayment.   Under such agreement, American

Express was granted a security interest covering any and all amounts owing to Debtor now and in

the future from any merchant processor(s) processing charges made by customers of Debtor via

credit or debit card transactions; all other tangible and intangible personal property, including, but not limited to (a) inventory, (b) equipment, (c) investment property, including certificated and uncertificated securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (d) instruments , and any other Collateral as defined in the Business Loan and Security Agreement.   Pursuant to an Order dated October 18, 2016, the Debtor is authorized to use cash collateral (the "Cash Collateral Order"); provided, however, that the Debtor must make adequate protection payments to American Express equal to 5% of the American Express credit card receivables.    American Express is presently owed approximately $90,000 (the "American Express Claim").

**(c) <u>Rewards Network</u>**

12.    Pursuant to a Receivables Purchase and Marketing Agreement dated March 10, 2016 among the Debtor, La Boucherie, and Rewards Network Establishment Services Inc. ("Rewards Network"), Rewards Networks purports to have purchased $768,000 in future credit card receivables of the Debtor and La Boucherie for an upfront payment of $600,000.   The Receivables Purchase and Marketing Agreement grants a security interest to Rewards Network in all assets of the Debtor if the Debtor or La Boucherie commits a "bad act" in accordance with Section 12 of the agreement.   Rewards Network has filed a UCC-1 Financing Statement to perfect its security interest.

13.    Prior to the Petition Date, Rewards Network commenced litigation in the United States District Court for the District of Illinois ("Illinois Court Action") asserting claims against La Boucherie Inc. and Lajaunie under the Receivables Purchase and Marketing Agreement.   The litigation is based on purported "bad acts" allegedly arising out of the closing of the restaurant operated by La Boucherie Inc.

14.    Pursuant to the Cash Collateral Order, the Debtor is currently paying 4% of all

MasterCard and Visa credit card receivables to Rewards Network.    Rewards Network asserts that

it is owed over $600,000 (the "Rewards Claim").

**D.    The Pre-Petition Employee Litigations**

(a) **The Class Action**

15.    This Petition was filed to forestall litigation which had been commenced by

former employees of the Debtor, which litigation is currently pending in the United States

District Court for the Southern District of New York (the "District Court") in an action entitled

*Murphy v. Lajaunie* (Index No. 13-cv-06503) (the "Class Action").    In or about 2012, a single

employee of the Debtor commenced the Class Action against the Debtor, Lajaunie, and other

entity defendants.    The number of plaintiffs gradually increased in size until today where there

are approximately 400 employees represented in the Class Action, which class was certified by

District Court.    Two potential members of the class opted out at the time of this certification. All

members or potential members of the Class Action shall hereinafter be referred to as the "Class

Action Plaintiffs."

16.    The Class Action is extremely complicated and brings into play a whole host of

issues concerning labor law violations, factual issues relating to control and the actual

circumstances of the employees.    Each employee has a different fact pattern which would require

a different potential legal analysis, and different amounts are involved for wages over time, hourly

rates and vacation and severance payments.    Further, although approximately 50% of the class

members were employed La Boucherie, Inc., a defendant in the Class Action, the employees

asserted that the Debtor was jointly and severally liable for their claims.

17.    The Debtor expended substantial and significant funds in attorney's fees and other

costs to defend this litigation.    However, in or about August 10, 2016, the District Court entered

a default judgment as to liability only against all defendants in the Class Action based upon

purported violations of discovery production, and directed an inquest on damages. Such inquest was scheduled to be heard on November 9, 2016, but was stayed by the filing of this bankruptcy case. The lead plaintiffs in the Class Action (the "Class Representatives") filed a class claim on behalf of all Class Action Plaintiffs (except the opt-outs) in the amount of $5,616,730 (the "Class Claim").

18.     Although extremely difficult to estimate, the Debtor could incur hundreds of thousands of dollars to attempt to vacate the default judgment based on a discovery violation, and then proceed to trial.   There is no assurance that the Debtor could prevail but there is assurance that the legal costs and expenses will be very substantial.   The best result for all creditors is for the Debtor to confirm a plan that establishes its liability and avoid a major drain on its attention and its resources.

### (b) **The Ponce Creditors**

19.     In addition to the Class Action, prior to the Chapter 11 filing, certain creditors, former employees of the Debtor, consisting of Arturo Ponce, Nabor Hernandez and Joe Perea (the "Ponce Creditors") obtained a settlement in the amount of $145,000 providing for monthly payments of $6,041.66, and upon default, for confessions of judgment against the Debtor and Lajaunie in the amount of $275,000 less any payments made under the settlement.   Subsequent to the Chapter 11 filing, certain payments of $6,041.66 were demanded, and unbeknownst to Debtor's counsel, were paid by the Debtor to the Ponce Creditors.

### (c) **Settlement Discussions**

20.     During this Chapter 11 proceeding, the Debtor and Lajaunie, through his own counsel, have attempted to resolve the Class Action and Ponce Creditors' claims.   Despite significant effort by the Debtor and Lajaunie, no settlement was reached, although the parties were close.   This Plan incorporates the framework of the settlement discussions with the Class Action

and Ponce Creditors, which is described below.

## E.    The Debtor's Lease

21.    The Debtor leases space for the restaurant at 15 John Street pursuant to a Lease with VJHC Holding Corp. (the "Landlord").   The Lease expires on December 31, 2019, and the rent is currently $32,000 per month.   Prior to the Chapter 11 case, the Landlord obtained a judgment for unpaid rent and charges under the Lease in an amount of $179,635.   On or after December 31, 2017, the Lease may be terminated prior to the expiration date on twelve (12) months written notice if the Landlord intends to redevelop, demolish, or reconstruct the premises.

22.    During the Chapter 11 case, the Debtor was generally current on the Lease, but is presently two months in arrears on rent due to the normal seasonal cycle.   Historically, rent is current by the second half of the year, and the Debtor anticipates the same to occur here.   By Motion dated December 30, 2016, the Debtor sought to assume the Lease pursuant to § 365 of the Bankruptcy Code.   That Motion has been adjourned from time to time, while the Debtor and the Landlord negotiate the terms of an assumption.

## F.    Other Important Bankruptcy Events

23.    By Order dated December 12, 2016 [Dkt. No. 50] the Debtor established a bar date in this bankruptcy case.    By Motion dated March 27, 2017 [Dkt. No. 82], the Debtor seeks to establish a new bar date solely for certain potential employee priority claimants.

<u>**SOURCE OF FUNDS FOR PLAN**</u>

24.    The Plan is funded primarily by Lajaunie.   Lajaunie is selling his condominium located in Colorado (the "Condo"), and will contribute all proceeds from the sale, net of mortgages, deeds of trusts, and liens against the Condo, and net of any ordinary closing costs and attorneys' fees directly related to the closing, to fund the Plan.   The Condo is encumbered by three deeds of trust in the respective amounts of $300,000, $100,000, and $60,000.   Lajaunie has

advised that he is discussing with the holders of the $100,000 and $60,000 deeds of trust reductions with the goal of collectively reducing those two deeds of trust by $100,000.   Lajaunie believes that this can be accomplished.

25.      The Plan will also be funded by available funds from the operation of the Debtor as of the Effective Date, which likely will be minimal.   The Debtor anticipates that the sale of the Condo plus the funds of the Debtor will total $130,000 to fund the Plan.

26.      Lajaunie engaged a broker and has been attempting to sell the Condo for over a year.   If the Condo is not sold by the Effective Date, Lajaunie shall grant the Debtor a deed of trust on the Condo to ensure that the net proceeds of any sale will be received by the Reorganized Debtor.

27.      Assuming $134,800 in cash to fund the Plan, the following are the amounts of the funds necessary for confirmation of the Plan:

| | | |
|---|---|---|
| (1) | Leo Fox, Esq., Counsel to Debtor (§ 507(a)(1)) (net after prior payments) (Administration – Priority) | $29,800 |
| (2) | Aronson LLC (Accountants to Debtor) (§ 507(a)(1)) (net after prior payments) (Administration – Priority) | $0[3] |
| (3) | United States Trustee Fees | $5,000 (estimate) |
| (4) | Landlord Initial Cure Payment | $70,000 |
| (5) | Class Action (Class 8) | $30,000 |
| | **TOTAL** | **$134,800** |

## SUMMARY OF PLAN

28.      The Plan is composed of 11 Classes.   All Classes are impaired, except Class 1.

29.      **Class 1** consists of the Allowed TD Bank Claim.   The TD Bank Claim shall be

---

3 The Debtor has been holding $2,000/month for Aronson's fees pending its fee applications with this Court. Accordingly, the Debtor presumes that Aronson will be paid in full on the Effective Date and does not include the escrowed payments as cash available on the Effective Date.

reinstated.    The Debtor currently pays approximately $500 per month to TD Bank, in accordance with the existing Loan Agreements.    This Class is not impaired and shall not vote on the Plan.

30.    **Class 2** consists of the Allowed American Express Claim.    Commencing on the Effective Date, American Express shall be paid on a monthly basis an amount equal to 4% of all American Express credit card receivables during the 2017 year, 5% of all American Express credit card receivables during 2018 year, and 6% of all American Express credit card receivables during the 2019 year until the Allowed American Express Claim is paid in full.    Subject to the foregoing, such payments shall be made in accordance with the present collection practices provided to such creditor under the Cash Collateral Order.    This Class is impaired and shall vote on the Plan.

31.    **Class 3** consists of the Allowed Rewards Network Claim.    Commencing on the Effective Date, Rewards shall be paid on a monthly basis 4% of all MasterCard and Visa credit card receivables during the 2017 year, 5% of all MasterCard and Visa credit card receivables during 2018 year, and 6% of all MasterCard and Visa credit card receivables during the 2019 year. Subject to the foregoing, such payments shall be made in accordance with the present collection practices provided to such creditor under the Cash Collateral Order, and shall be in full satisfaction of all claims held by Rewards Network. On the Effective Date, this creditor shall dismiss, with prejudice, the Illinois Court Action.    This Class is impaired and shall vote on the Plan.

32.    **Class 4** consists of the priority claims of employees for services rendered within the six (6) week period prior to the Petition Date pursuant to § 507(a)(4) of the Bankruptcy Code. These creditors filed priority claims totaling $12,702.18.    All Allowed Class 4 Claims shall be paid in cash in equal quarterly installments in the second and third year after the Plan (2018 and 2019), commencing March 31, 2018.    This Class is impaired and shall vote on the Plan.

33.    Certain potential members of Class 4 have alleged that they may not have received notice of the Bar Date.    A number of these employees have moved during the course of the

Chapter 11 case.    Accordingly, the Debtor intends to fix a new Bar Date to provide potential Class 4 creditors with another opportunity to file claims.    Employees who do not file claims, or file only unsecured claims, shall be treated as unsecured creditors and classified in Class 10.

34.    **Class 5** consists of the priority claims of the Internal Revenue Service (the "IRS") pursuant to § 507(a)(8) of the Bankruptcy Code.    The IRS filed a claim (No. 45-2) in the amount of $0 for purported priority corporate income tax plus an unsecured claim in the amount of $2,340. The Debtor contends that the IRS does not have any priority claim or any other claim, and may object to the claim.    The Debtor shall pay any priority taxes to the IRS determined to be due pursuant to § 1129(9)(C) over in two installments: (i) 50% by December 31, 2018, and (ii) 50% by December 31, 2019.    This Class is not impaired and shall not vote on the Plan.

35.    **Class 6** consists of the priority claims of the New York State Department of Taxation and Finance ("NYSTF") pursuant to § 507(a)(8) of the Bankruptcy Code.    NYSTF filed a claim (No. 31-3) that asserts an aggregate amount purportedly owed by the Debtor and at least two non-debtor entities (Le Marais 2K, Corp. and La Boucherie), for (i) priority sales taxes in the amount of $19,613.66, (ii) corporate franchise taxes in the priority amount of $2,176.06 as and general unsecured amount of $352.    The Debtor shall seek to settle such amounts with the taxing authorities or will submit the dispute of the amount to this Court.    The Debtor shall pay any priority taxes determined to be due pursuant to § 1129(9)(C) over in quarterly payments commencing March 31, 2018, with each installment being in the sum of 1/8 of the total Allowed Class 6 claim.    This Class is impaired and shall vote on the Plan.

36.    **Class 7A and 7B.**    Class 7 consists of the priority claims of the New York City Department of Finance ("NYCDOF").    NYCDOF filed a claim (No. 56) for (i) general corporate income taxes in the alleged amount of $66,888.79, plus $25,588.20 in purported interest and penalties, (ii) commercial rent tax in the alleged amount of $23,441.60, plus $5,738.97 in

purported interest and penalties, and (iii) liquor license tax in the amount of $544, plus $57.24 in purported interest and penalties.

37.     Class 7A consists of the NYCDOF claim for general corporate income taxes for the period January 1, 2013 to December 31, 2015, and the liquor license tax, and Class 7B consists of the NYCDOF claim for commercial rent tax for the period January 1, 2015 to August 25, 2016. The Debtor believes that the general corporate taxes are inflated because the Debtor paid such taxes in 2013, but such amounts are nevertheless sought in the NYCDOF claim.   In addition, a portion of the commercial rent tax amounts, even if otherwise correct and allowable, may be deemed non-priority as property taxes which were last payable without penalty more than one (1) year before the filing of the bankruptcy petition pursuant to § 507(a)(8)(B) of the Bankruptcy Code to the extent of the taxes asserted for the period January 2015 through August 24, 2015, which is the period more than one (1) year before the Petition Date.   Further, all penalties are unsecured claims.

38.     The Debtor is presently negotiating this claim with the NYCDOF.   To the extent that the NYCDOF's taxes are determined or agreed to be priority taxes pursuant § 507(a)(8), the Debtor will (i) pay amounts in Class 7A in two installments: 50% by December 31, 2018, and 50% by December 31, 2019, (ii) pay amounts in Class 7B in quarterly payments commencing March 31, 2019, which payments shall have a value as of the Effective Date of the Plan equal to the Allowed amount of such claim.   This Class is impaired and shall vote on the Plan.

39.     The following chart reflects the Debtor's current assessment of the priority tax liability owed to holders of claims in Classes 5, 6 and 7 without prejudice to amendment.

| Class | Claimant | Estimated Priority Amount |
|---|---|---|
| Class 5 | IRS | $0 |
| Class 6 | NYSTF | $22,000.00 |
| Class 7A | NYCDOF | $25,000.00 |

| Class 7B | NYCDOF | $23,000.00 |
| Unclassified | NYS Department of Labor | $110.00 |

40.    **Class 8** consists of all claims of the Class Action Plaintiffs, including the two "opt out" class members and class members who may have filed their own claims.   The opt-out class members did not receive notice of the Bar Date.   Accordingly, the Debtor shall fix a new bar date for the two opt-out class members to file claims that would be classified in Class 8.

41.    Claimants in Class 8 shall receive *pro rata*:

    a.  On the Effective Date, the Effective Date Class Payment;

    b.  In the year 2017, $15,000 if the Debtor realizes $120,000 in Net Income, plus 35% of all Net Income after the Debtor realizes $140,000 in Net Income;

    c.  In the year 2018, 35% of all Net Income after the Debtor realizes $37,500 in Net Income, plus 50% of the Deferred Class Payment;

    d.  In year 2019, 35% of Net Income, plus 50% of the Deferred Class Payment;

    e.  In the years 2020 and 2021 (subject to an extension being given to the Lease), 35% of Net Income.

42.    **Class 9** consists of all claims of the Ponce Creditors.   Claimants in Class 9 shall receive *pro rata*:

    a.  In the year 2017, $5,000 if the Debtor realizes $120,000 in Net Income, plus 5% of all Net Income after the Debtor realizes $140,000 in Net Income;

    b.  In the year 2018, 5% of all Net Income after the Debtor realizes $37,500 in Net Income, plus 50% of the Deferred Ponce Payment;

    c.  In year 2019, 5% of Net Income, plus 50% of the Deferred Ponce Payment;

    d.  In the years 2020 and 2021 (subject to an extension being given to the Lease), 5% of Net Income.

43.     The Debtor hoped to make a payment of $110,000 to holders of Class 8 Claims and a payment of $20,000 to holders of Class 9 Claims on the Effective Date.    Due to a weaker than expected market for the Condo, the Debtor likely will not have sufficient funds to make such payments as well as all other amounts that must be paid on the Effective Date.    To the extent that there is insufficient cash on the Effective Date to pay (i) the initial payment to Landlord on its cure claim, (ii) the administrative fees of professionals retained by the Debtor payable on the Effective Date (up to the amounts set forth in Paragraph 27 hereof), (iii) United States Trustee fees, and (iv) the foregoing payments to holders of Claims in Classes 8 and 9, then, from cash available on the Effective Date after the initial payment to the Landlord, payment of administrative fees, and payment of United States Trustee fees, Class 8 shall receive 100% of the remaining funds (the "**Effective Date Class Payment**").    The Debtor shall not make any payments to holders of Class 9 Claims on the Effective Date to, in effect, recoup the post-petition payments made to the holders of such claims.

44.     The difference between $110,000 and the Effective Date Class Payment (the "**Deferred Class Payments**") and $7,500 for Class 9 Creditors (the "**Deferred Ponce Payments**") shall be payable in two installments: (i) 50% by December 31, 2018, and (ii) 50% by December 31, 2019.

45.     **Class 10** consists of the claims of all general unsecured creditors including trade creditors, non-priority employee creditors, any deficiency claims owed to secured creditors, claims of rejected executory contracts, non-priority tax claims, and any other claims which fall within the definition of an unsecured creditor.    The Debtor estimates such claims equal approximately $1,200,000.

46.     Holders of Class 10 Claims shall receive shall receive *pro rata*:

        a.    In the year 2017, 10% of all Net Income after the Debtor realizes $140,000 in

Net Income;

    b.   In the year 2018, 10% of all Net Income after the Debtor realizes $37,500 in Net Income;

    c.   In year 2019, 10% of Net Income.

47.    **Class 11** consists of the equity interest of Lajaunie as the 100% equity holder of the Debtor.   Pursuant to the Plan, Lajaunie shall not receive any distribution on account of his equity interest.   Lajaunie shall transfer his 100% equity interest into escrow, which shall be returned to him on the first anniversary of the Effective Date (in the event there has not been a prior transfer of such escrow shares) assuming all payments under the Plan have been made.

## VOTING PROCEDURES FOR THE CLASS

48.    The lead plaintiffs for the Class Action have filed a class proof of claim.    In addition, several Class Action Plaintiffs may have filed their own claims based on the circumstance that they had been previously employed and were priority pre-petition employees, and accordingly received notice of the Bar Date.

49.    The Plan provides that each member of the Class Action has one vote that can be voted by the Class Representatives for purposes of § 1126(c) of the Bankruptcy Code.   *In Home Mortgage Realty Trust*, 125 B.R. 575, 583-84 (Bankr. C.D. Calif. 1991) (when both the class representative and hundreds of individuals, class voters voted, the Court determined that "the individual votes must be counted and class representatives are permitted to vote only for the class members who have not voted individually for or against the Plan.").   Accordingly, it is submitted that the Court may calculate the votes for members of the Class Action by calculating one vote per member who do not vote but instead relied on the Class Representative to vote the class proof of claim.

## LAJAUNIE AND THE DEBTOR

50.     Post-Effective Date, Lajaunie shall continue to manage and operate the Debtor. The Debtor and Lajaunie shall enter into a three year employment contract that provides that Lajaunie shall receive:

    a.    In the year 2017, $80,000 in annual salary, plus 10% of the Net Income of the Debtor after the first $140,000 of Net Income;

    b.    In the year 2018, $90,000 in annual salary, plus 10% of the Net Income of the Debtor after the first $37,500 of Net Income; and

    c.    In year 2019, $100,000 in annual salary, plus 10% of the Net Income of the Debtor.

51.     For years 2017, 2018, 2019, Lajaunie shall pay 10% of any Net Cash Income[4], in excess of the first $200,000 of Net Cash Income received by Lajaunie from sources other than his work for this Debtor, to holders of Claims in Class 8 (88%) and Class 9 (12%).

52.     Other than amounts provided above for Lajaunie, the Debtor shall not pay or transfer any sums to Lajaunie or his immediate family members directly or indirectly, and shall not pay any third parties with the understanding that such parties will subsequently transfer any such amounts to Lajaunie or any of his immediate family.

## **ADMINISTRATION EXPENSES AND UNCLASSIFIED CLAIMS**

53.     Chapter 11 administration creditors, including the professionals for the Debtor who have rendered services and who are entitled to compensation under §§ 327 and 503(b) of the Bankruptcy Code, and the fees payable to the Office of the United States Trustee under 28 U.S.C. § 1930, are not classified.   All fees of professionals retained by the Debtor shall be approved by the Bankruptcy Court.   To the extent that the professional fees approved by the

---

4 "Net Cash Income" shall mean Lajaunie's net income after he pays all income taxes and shall not include any items that may be income for tax purposes but do not constitute the receipt by Lajaunie of cash, such as forgiveness of debt or pass-through income from entities, and shall not include any income from this Debtor.   Net Cash Income shall be reduced by any loss carry forwards from prior years, such as capital losses.

Bankruptcy Court for the Debtor's counsel and/or accountants exceed the estimates described in paragraph 27 above, the amount in excess of the estimate will not be paid on the Effective Date but instead will be paid 50% by [_____], 2018 and 50% by November 30, 2018.

54.    All post-confirmation quarterly reports and quarterly fees required by the United States Trustee under 28 U.S.C. § 1930 shall be filed and paid on a quarterly basis until entry of a final decree, dismissal of the case or conversion to Chapter 7.

## THE REORGANIZED DEBTOR

55.    Upon the Effective Date, the Debtor will become the Reorganized Debtor and shall have achieved a reorganization involving the various claims of all the creditors under the Plan.    The Reorganized Debtor will continue to make payments under the Plan.    Annexed hereto are projections and a pro forma Confirmation balance sheet (Exhibit C).

## THE LIQUIDATION ANALYSIS

56.    The Debtor believes that the only alternative to confirming this Chapter 11 Plan is a conversion of this case to a case under Chapter 7 of the Bankruptcy Code.    Annexed hereto as Exhibit D is a liquidation analysis of the Debtor's assets.    The analysis represents the Debtor's effort to estimate the results of an immediate liquidation under Chapter 7 of the Bankruptcy Code.    As demonstrated therein, creditors will receive far less in a Chapter 7 case.    .

## EXECUTORY CONTRACTS

57.    The Plan provides that the Lease will be assumed subject to the following terms: (i) payment of $70,000 on the Effective Date, and (ii) payment of the balance of the cure amount (approximately $110,000) in equal monthly installments over the remainder of the Lease term (approximately December 2019),.    This assures the Debtor that it will continue to pay down the arrears provided that the Landlord does not terminate the Lease in the last year.    If the Lease cannot be assumed, the Plan cannot be confirmed.

58.    The Debtor will reject any other executory contracts on the Effective Date, other than the Lease and any contracts with Gravity Payments, the Debtor's credit card payment processor.    For the avoidance of doubt, the Debtor's liquor license is not an executory contract and the Reorganized Debtor shall continue to operate in accordance with the liquor license. Persons holding claims as a result of the rejection of any executory agreement may file a claim with the Bankruptcy Court within 30 days of the rejection.

## TAX IMPLICATIONS

59.    The Debtor is not aware of any significant tax implication which would inure to the Debtor as a result of the filing and confirming of this Plan.    The Debtor suggests that creditors consult their tax advisors with respect to the implication of the Plan and the Confirmation upon such creditors.

## PREFERENCE AND FRAUDULENT CONVEYANCE ACTIONS

60.    The Debtor has reviewed its books and records and has investigated whether there are any valid causes of action, including proceedings to avoid transfers including, but not limited to, proceedings under §§ 544(b), 547, 548, 549, 550 of the Bankruptcy Code or applicable state law.    After analyzing the risks and expenses related to the prosecution of and the limited recovery, if any, which would inure to the benefit of the creditors in the event that the Debtor is successful, and the ability to collect on any judgments obtained, the Debtor has determined that it does not intend to institute any future causes of action for preference or fraudulent conveyance.

## RETENTION OF JURISDICTION BY THE COURT

61.    The Plan provides that the Court shall retain jurisdiction for specified purposes, including without limitation, the determination of all controversies arising under or in regard to the Plan, objections to claims, hearing and determining applications for allowances of compensation and reimbursement of expenses, and the enforcement or continuation of orders

entered in this case, until substantial consummation, and closing of the case.

## DISCHARGE AND RELEASES

62.    Pursuant to Section 1141(d) of the Bankruptcy Code, the Confirmation Order shall discharge all claims against the Debtor.    Except as expressly provided herein, the rights afforded in the Plan and the treatment of all Creditors and Holders of Stock Interest provided herein shall be in exchange for and in complete satisfaction, discharge and release of all Claims as of the Effective Date, of any nature whatsoever, whether known or unknown, contingent or liquidated including any interest accrued or expenses incurred thereon from and after the Petition Date, against the Debtor, the Debtor-in-Possession or the reorganized Debtor (or any of their properties or interest in properties), Except as otherwise provided in the Plan, upon the Consummation Date, all Claims against the Debtor and will be satisfied, discharged and released in full exchange for the consideration provided for hereunder.    All persons and entities shall be precluded from asserting against the Debtor, the reorganized Debtor, its successors, or its respective assets or properties,    any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date

63.    Except as otherwise provided in the Plan or Confirmation Order on and after the Confirmation Date, all entities which have held, currently hold or may hold a debt, claim, other liability or interest against the Debtor that would be discharged upon Confirmation of this Plan, pursuant to the provisions of Section 1141(d) of the Bankruptcy Code and this Section, are permanently enjoined from taking any of the following actions on account of such debt, claim, liability, interest or right: (a) commencing or continuing in any manner any action or other proceeding on account of such claim against property which is to be distributed under this Plan, other than to enforce any right to distribution with respect to such property under the Plan; (b) enforcing, attaching collecting or recovering in any manner or judgment, award, decree, order

other than as permitted under Sub-paragraph (a) above; and (c) creating, perfecting or enforcing any lien or encumbrance against any property to be distributed under this Plan.

64.    To the extent permitted by applicable law, if the respective affiliates, officers, directors, members, representatives, attorneys, accountants, financial advisors, and agents of the Debtor and their professionals act in good faith, they shall not be liable to any holder of a Claim, or any party with respect to any action, forbearance from action, decision, or exercise of discretion taken during the period from the Petition Date to the Effective Date in connection with (a) the operation of the Debtor; (b) the proposal or implementation of any of the transactions provided for or contemplated under this Plan; or (c) the administration of this Plan or the distribution to be made pursuant to this Plan, other than for willful misconduct or gross negligence.    The Debtor and its respective affiliates, officers, directors, members, representatives, attorneys, accountants, financial advisors, and agents, may rely on the opinions of counsel, certified public accountants, and other experts or professionals employed by the Debtor, and such reliance shall conclusively establish good faith.    Any objection to this Section by any holder of a Claim or equity interest shall be filed by the deadline established by the Bankruptcy Court for objecting to Confirmation of this Plan or shall be waived.

65.    On the Effective Date, to the fullest extent permissible under applicable law, the Debtor and Debtor-in-Possession shall be deemed to forever release, waive and discharge all claims, demands, debts, rights, causes of action or liabilities (other than the right to enforce the obligations of any party under the Plan and the documents delivered in connection therewith) against Lajaunie, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, equity or otherwise, that relate in any way to the Debtor or Debtor-in-Possession, that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the

23

Effective Date, and that could have been asserted by or on behalf of the Debtor or its Estate, whether directly, indirectly, derivatively or in any representative or other capacity.   Nothing in this Section shall be construed as a release of any fraud, gross negligence, or willful misconduct.

66.    On the Effective Date, to the fullest extent permissible under applicable law, each holder of a claim that receives a distribution under the Plan, in consideration for the Plan distributions and other obligations of the Debtor and reorganized Debtor under the Plan, will be deemed to consensually forever release, waive and discharge all claims, demands, debts, rights, causes of action or liabilities (other than the right to enforce the obligations of any party under the Plan and the documents delivered in connection therewith) against Lajaunie, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, equity or otherwise, that relate in any way to the Debtor or Debtor-in-Possession and that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date.

67.    It has been held that a Plan may be filed in the Chapter 11 case of a corporation, which is to be funded, in significant part, through the corporate officer's personal assets entitling such officer to the issuance of a stay and release of claims against the corporate officer as a non-debtor.   See *SEC v. Drexel Burnham Lambert Group, Inc*.   (*In re Drexel Burnham Lambert Group, Inc.*), 960 F.2s 285, 293 (2d Cir. 1992), cert. dismissed, 506 U.S. 1088, 113 S.Ct. 1070, 122 L.3d.2d 497 (1993); *In re A.H. Robins Co.*, 880 F.2d 694, 701 94th Cir.), cert denied, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1898); *MacArthur Co. v. John s-Manville Corp.* (*In re Johns-Manville Corp.*), 837 F.2d 89, 93-94 (2d Cir.), cert. denied, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.23d 145 (1988).

68.    More recent cases including *In re Metromedia Fiber Network Inc.*, 416 F.3d 136 (2nd Cir. 2005); *In re Sabine Oil & Gas Corporation*, 555 B.R. 180 (Bkrtcy. S.D.N.Y. 2016) and *In*

*re Genco Shipping & Trading Limited*, 513 B.R. 233 (Bkrtcy. S.D.N.Y. 2014) have stated that such releases are "heavily scrutinized".   However, Lajaunie may be entitled to releases on the Class Action claims even under these recent cases.

69.    Here, Lajaunie will be paying 100% of the initial cash payment under the Plan and will continue to work at the restaurant lending his reputation and efforts to contribute to the success of the operation of the restaurant.   This meets the Metromedia standard in that: (1) his monetary contribution to the Plan as well as his non-monetary contributions, including supporting the restaurant and potentially raising cash for the restaurant, (2) Lajaunie has agreed to pay a portion of his non-Debtor Net Cash Income directly to holders of claims is Class 8 and Class 9 separate and apart from the distributions by the Debtor under the Plan, (3) Lajaunie could assert that the Debtor is responsible for claims against him under subrogation or indemnity theory (or under the employment agreement or by-laws), (4) these enjoined creditors are not being paid in full but are getting the available monies from all sources, and (5) finally, as noted, Lajaunie is putting up a substantial percent of the Plan consideration

## EFFECTS OF COURT'S CONFIRMATION AND FEASIBILITY OF THE PLAN

70.    The effects of Confirmation of the Plan are set forth in the Bankruptcy Code. The following is a brief summary of the effect of Confirmation upon the Debtor, its creditors, and other interested parties. Upon the Effective Date, the provisions of the Plan will bind the Debtor and its creditors, whether or not they have accepted the Plan. All liens and claims are canceled and extinguished unless dealt with differently in the Plan.   Satisfaction of the Debtor's pre-Chapter 11 debts and those incurred subsequently to the commencement of this case all are governed by the Plan.

71.    The Debtor believes that the Plan is feasible and that Confirmation is not likely to be followed by liquidation or the need for further financial reorganization.

## ANTICIPATED CONFIRMATION DATE

72.    It is anticipated the Plan will be confirmed by the Bankruptcy Court within forty

(40) days, assuming the following events take place:

      A.    The Plan is duly accepted by creditors; and

      B.    The Bankruptcy Court finds that the Plan is feasible and in the best state of
creditors; and

      C.    The Court finds that the Plan is fair and equitable and does not
discriminate unfairly; and

      D.    The Debtor has made arrangement with the professionals
for the payment of professional fees.

## WHERE TO FILE BALLOTS ON THE PLAN

73.    Pursuant to a Court Order approving this Disclosure Statement, ballots on the

Debtor's Plan must be received by _____, 2017.   All ballots should be properly completed

and forwarded to: Leo Fox, Esq., 630 Third Avenue, 18th Floor, New York, New York 10017.


Dated: New York, New York
      May 8, 2017

          *15 JOHN CORP.*
          *a/k/a LES HALLES*
          *a/k/a FIRST ADMIN, INC.*

      By: _____
          Philippe Lajaunie
          President

*/s/ Leo Fox*
LEO FOX, ESQ. (LF-1947)
Attorney for Debtor
630 Third Avenue, 18th Floor
New York, New York 10017
(212) 867-9595